Filed 12/3/20  P. v. Alexander CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LAMAR ALEXANDER,<br><br>    Defendant and Appellant. | D077132<br><br><br><br>(Super. Ct. No.  SCD282614 ) |

APPEAL from a postjudgment order of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed; remanded with directions.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

Lamar Alexander was charged with forcible oral copulation (Pen. Code,[1] § 287, subd. (c)(2)(a); count 1); two counts of willful infliction of corporal injury (§ 273.5, subd. (a); counts 2 and 4); and one count of unlawfully taking or driving a vehicle valued over $950 without the owner's consent (Veh. Code, § 10851, subd. (a); count 3). As to counts 2 and 4, it was alleged that Alexander personally inflicted great bodily injury on the victim (§ 12022.7, subd. (e)). The information also alleged Alexander had a prior strike conviction (§§ 667, subds. (b)-(i), 668, 1170.12), a prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), a prior prison term (§ 667.5, subd. (a)), and two prior convictions that rendered him ineligible for probation (§ 1203, subd. (e)(4)).

A jury convicted Alexander of count 2, but found not true the allegation that he personally inflicted great bodily injury on the victim. The jury acquitted Alexander on counts 1 and 3 and failed to reach a verdict on count 4. The court then granted the prosecution's motion to dismiss count 4.

In a bifurcated proceeding, Alexander admitted he had a prior strike conviction and two prior convictions that rendered him ineligible for probation.

The court sentenced Alexander to prison for the upper term of four years, which was doubled to eight years for the prior strike conviction. In addition, the court issued two protective orders under section 136.2—one for

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

the victim in the instant matter (S.L.) and the other for a witness (K.S.)[2] in this case who was a victim in a previous case against Alexander.

Alexander appeals, challenging only the issuing of the protective order against K.S. Although he did not object to the protective order, Alexander maintains the order was unauthorized; thus, he can raise this objection at any time. We conclude the court was authorized to issue a protective order in favor of K.S. As such, we determine Alexander forfeited his challenge here and affirm.

## FACTUAL BACKGROUND

Alexander does not challenge his conviction, and the parties do not dispute the majority of the facts. Therefore, we will adopt the factual summary from the respondent's brief to provide background for our later discussion of the protective order issued in favor of K.S.

## Prosecution

Around March of 2019, S.L. met Alexander at a Jewish community services center in San Diego. S.L. and Alexander were both homeless and lived out of their cars, which they parked in the parking lot at the community services center. They became friends and then began a sexual relationship on Easter of that year. Alexander's car was subsequently damaged in a car accident, and he stayed with S.L. in her car. They occasionally stayed in motels.

---

[2] This witness's name was spelled three different ways in the record. We identify the witness by her initials based upon the spelling of her name as it appears in the reporter's transcript. From our review of the record, it appears that the different spellings were simply clerical errors. There was only one witness who testified at trial, who was not the victim of the underlying offenses, and also was the subject of a protective order. To avoid confusion, we refer to this witness as "K.S." throughout this opinion.

On June 8, 2019, they were staying at a motel in San Diego when Alexander choked S.L. while she was on the bed.[3] S.L. could not breathe and felt Alexander was going to kill her. S.L. was "close to blacking out" when Alexander finally released his grip. S.L. suffered bruising to her neck, face, and eyes. She did not report the incident to the police.

A few days later on June 12, while she was driving, S.L. noticed a car following her and believed it was Alexander. She panicked and called the police. When the police arrived, S.L. and the officer checked and confirmed that it was not Alexander in the car S.L. believed was following her. After that incident, S.L. told Alexander that their relationship was over.

Alexander proceeded to call S.L. and told her that he had no means of transportation. S.L. eventually gave in and drove him to the showers at the beach and to work. He reimbursed her for gas. Although they did not resume their relationship, S.L. also agreed to stay at motels with Alexander again.

On July 21, 2019, S.L. and Alexander checked in at the Days Inn on Adobe Falls Road after they bought groceries. They both drank beer and other alcoholic drinks in the motel room. At some point thereafter, Alexander left the room. She called Alexander two or three times and sent him at least three text messages; he did not pick up the phone or respond to her messages.

When Alexander returned to the motel room, he told S.L. that he went to buy groceries for breakfast in a matter-of-fact manner. S.L. was very angry. Alexander then began cooking and made himself a drink. S.L. and Alexander began to argue. Alexander approached S.L., who was sitting on one of the two beds, and pulled her feet out from underneath her, dragged her

---

[3] The jury did not reach a verdict on count 4, which was based on the June 8 incident.

4

to the foot of the bed, and pulled off her pants and underwear. When S.L. kicked him, Alexander punched S.L.'s leg. When she managed to kick him again, Alexander got on top of her, straddled her, and punched her face with both of his fists.

At some point during the attack, S.L. called 911. The police eventually showed up to the motel room and S.L. was taken to the hospital by an ambulance. S.L. suffered bruising and cuts to her face and her hand. Specifically, her nose was cut and bleeding, she had cuts on her eyelid and chin, and her eyes were swollen shut. S.L. also had a bruise on her leg from Alexander punching it.

K.S., Alexander's ex-wife, testified at trial. They were married for five years but had been in a relationship for 22 years. When she was 16 years old, Alexander beat K.S. at his cousin's house after she made a comment about him going to a baseball game with friends. He pulled her by the hair into the bathroom and gave her a bloody nose. He cried, apologized, and said it would never happen again. On a subsequent occasion, Alexander choked K.S. with his hands in his grandmother's car until she lost consciousness.

After their daughter was born in 1987, Alexander choked K.S. again to take money she had saved to buy a stroller. He subsequently choked her again after they had an argument in Golden Hill. He rolled up a towel, came up from behind her, and choked her with the towel until she told him where she had hidden money.

After their son was born in 1993, Alexander hit K.S. in the head as she was driving them home from a Chargers game. When their son was 10 years old, Alexander and K.S. had an argument while they were staying in a hotel on New Year's Eve. K.S. had refused to give Alexander the car keys because they had been drinking. After Alexander demanded the keys from K.S., he

5

threatened her, "You need to release the car or I'm going to come back and throw you over the balcony."

In 2007, before she left him, they were in Temecula when she came home to Alexander pacing. When Alexander discussed their daughter and son-in-law's relationship, K.S. told Alexander that it was not their business and they should stay out of it. Alexander became irate and threw a meat cleaver at K.S. The cleaver flew by K.S.'s head and their six-month-old grandson. That night, Alexander fought with K.S. and threw her several times onto the bed. K.S. went to work with bruises on her arm. After that incident, K.S. stopped making excuses for Alexander and left him. She called the police to escort her while she retrieved some of her belongings from their house. Alexander continued to call K.S. and send her text messages as well as call her friends.

In January 2008, K.S. obtained a restraining order against Alexander.

On February 7, 2008, K.S. arrived at work and opened her car door to get out when she noticed Alexander running up to her. He reached her driver's side door and screamed at her. He then began punching her on the left side of her head. He next bit her left ear. He dragged K.S. out of her car and pulled her toward his car as she tried to resist by grabbing onto other cars in the parking lot. When she fell to the ground, Alexander began to kick her and told her to get up. A coworker heard K.S. screaming and grabbed Alexander. Meanwhile, K.S. was on top of the hood of a car. Alexander then bit K.S. in the chest. K.S. somehow managed to get away and got into her car. As she reversed her car to drive away, she observed Alexander reversing his own car "dead straight" toward her and with "full force." He hit a pole before driving forward and striking K.S.'s car. Alexander then got out of his car, pulled a bundle of firewood out of his car, and threw it into K.S.'s rear

6

windshield, smashing it. He next reached into K.S.'s car, through the broken windshield, grabbed ice tea bottles, and threw them at her. At that point, K.S.'s coworkers pinned Alexander to the ground, helped K.S. out of her car through the passenger side door, and escorted her inside.

## Defense

Alexander called several character and law enforcement witnesses, as well, and testified in his defense. Specifically, he testified that S.L. charged at him on June 8, 2019, because she wanted to go outside and see a brawl. She ran into his hands and that was the extent of the physical altercation. As for the night of July 21, 2019, Alexander testified that he told S.L. he was going to take her car to the store. According to Alexander, they had consensual oral sex. After he came back to the hotel room, they argued and S.L. told him that she called the police because he stole her car. When the police showed up at their room, S.L. put her arms around Alexander and started screaming to the police that they would have to break down the door. To get her off of him and reach the door, Alexander began to swing his elbows and struck her several times with his left and right elbows. He also "did a couple of heel kicks to get her off [him]."

## DISCUSSION

## I

## THE PROTECTIVE ORDER

### A. Alexander's Contentions

Alexander argues the court lacked the statutory authority under section 136.2 to issue a protective order as to K.S. Specifically, he argues that section 136.2 does not apply in the instant matter because the protective order issued after he was convicted and K.S. is not a victim as defined in the

7

statute. Alexander further argues good cause did not support the issuance of the protective order as to K.S.

## B. Background

Alexander admitted that he had a prior strike conviction for attempted murder. The victim in that case was K.S. K.S. testified against Alexander in the instant matter.

At the sentencing hearing, Alexander's trial counsel noted on the record that the prosecution was seeking ten-year protective orders for S.L. and K.S. He did not object to the orders, stating "we don't have any issues with [them]."

According to the probation report, Alexander was sentenced to seven years in prison for his 2008 conduct that resulted in convictions for attempted murder and assault. He was paroled in 2014 and discharged from parole in 2016. The probation officer noted that "[a]lthough he was law abiding after his release from prison, within three years of discharging from parole, he is now again before the Court for a felony domestic violence case involving injury to a previous significant other."

The trial court subsequently signed off on the protective orders and served Alexander with them. The orders prohibited any contact with S.L. and K.S. and indicated they were issued under section 136.2 and would expire after 10 years.

## C. Analysis

As a threshold matter, we observe that Alexander did not object in the trial court to the issuance of a protective order as to K.S. In fact, his attorney agreed to the issuance of that order. Typically, under such circumstances, we would find this issue forfeited. (*People v. Trujillo* (2015) 60 Cal.4th 850, 856-857.) However, Alexander contends forfeiture is not applicable here because

the challenged protective order is an unauthorized sentence, and, as such, this issue can be raised for the first time on appeal. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 995.) As we explain *post*, we determine that the trial court was authorized to issue the subject protective order; thus, Alexander forfeited his challenge here by not objecting in the trial court.

Alexander first argues the protective order in favor of K.S. is not authorized under section 136.2 because that statute does not provide for post-conviction protective orders. To this end, he urges us to follow *People v. Corrales* (2020) 46 Cal.App.5th 283 (*Corrales*). Alexander's reliance on that case is misplaced.

In this matter, in executing both the protective orders, the court checked a box on each of the form orders indicating it was issuing the protective orders under section 136.2. Section 136.2 authorizes protective orders during the pendency of criminal proceedings and as prejudgment orders. (See *Corrales*, *supra*, 46 Cal.App.5th at pp. 285-286.) Its purpose is to " ' "protect victims and witnesses in connection with the criminal proceeding in which the restraining order is issued in order to allow participation without fear of reprisal." ' [Citation.]" (*Id.* at p. 286.)

In *Corrales*, the appellate court reversed the trial court's postjudgment protective order issued under section 136.2 that prohibited the defendant from coming within 100 yards of a certain area.[4] The appellate court explained that "section 136.2 is not the proper vehicle for obtaining a postjudgment restraining order because that statute authorizes protective orders only during the pendency of criminal proceedings . . . ." (*Corrales*,

---

[4]     The defendant had been convicted of misdemeanor unlawful burning of property of another in violation of section 452, subdivision (d). The defendant had set fire to a palm tree next to a strip mall. (*Corrales*, *supra*, 46 Cal.App.5th at p. 285.)

*supra*, 46 Cal.App.5th at p. 287.)  However, the appellate court explicitly noted that subdivision (i)(1) of section 136.2 authorizes postjudgment orders in certain circumstances.  (*Corrales*, at pp. 286, 287, fn. 3.)  One such circumstance is a crime involving domestic violence, like the instant matter.  (See *id*. at p. 287, fn. 3; see § 136.2, subd. (i)(1).)

Here, the People argue the court simply made a clerical error and intended to check the box indicating that it was issuing the protective order under section 136.2, subdivision (i)(1).  Alexander maintains we cannot make that assumption.  The People have the better argument.

It is undisputed that Alexander was convicted of a species of domestic violence, more specifically, willful infliction of corporal injury.  Thus, he would be subject to the issuance of a protective order under section 136.2, subdivision (i)(1).[5]  From the context presented in the record, clearly such a protective order was the aim of the prosecution.  Indeed, at sentencing Alexander's trial counsel acknowledged that the prosecution was seeking two

---

[5]     Section 136.2, subdivision (i)(1) provides:  "When a criminal defendant has been convicted of a crime involving domestic violence as defined in Section 13700 or in Section 6211 of the Family Code, a violation of subdivision (a) of Section 236.1, Section 261, 261.5, 262, subdivision (a) of Section 266h, or subdivision (a) of Section 266i, a violation of Section 186.22, or a crime that requires the defendant to register pursuant to subdivision (c) of Section 290, the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with a victim of the crime. The order may be valid for up to 10 years, as determined by the court.  This protective order may be issued by the court regardless of whether the defendant is sentenced to the state prison or a county jail or subject to mandatory supervision, or whether imposition of sentence is suspended and the defendant is placed on probation.  It is the intent of the Legislature in enacting this subdivision that the duration of a restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of a victim and the victim's immediate family."

such orders and that he did not object to them. The court later issued the orders. It simply inadvertently checked the wrong boxes. This is clear scrivener's error, which we may order the trial court to correct. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Having determined that the court was issuing the protective order as to K.S. under section 136.2, subdivision (i)(1), we next turn to Alexander's claim that K.S. is not a victim as defined by the statute.

The standard for whether an individual is a victim for the purposes of a criminal protective order is broad. Victim is defined in section 136, subdivision (3), as "any natural person with respect to whom there is reason to believe that any crime as defined under the laws of this state or any other state or of the United States is being or has been perpetrated or attempted to be perpetrated." (§ 136, subd. (3); see *People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 465; *People v. Race* (2017) 18 Cal.App.5th 211, 219 [the term victim "must be construed broadly to include any individual against whom there is 'some evidence' from which the court could find the defendant had committed or attempted to commit some harm"].) A court may consider all competent evidence before it in determining whether to issue a criminal protective order pursuant to section 136.2. (*Race*, at p. 220.)

Here, it is undisputed that Alexander committed a crime involving domestic violence against K.S. And Alexander even concedes "it would seem that [K.S.] would be covered under" section 136.2, subdivision (i)(1) "on its face." However, Alexander argues that courts have not addressed whether victims of previous crimes by a defendant would qualify as victims under the statute, especially when "no evidence was presented" that they need any protection from the defendant. Alexander also points out that his crimes against K.S. were over ten years old.

In support of his position, Alexander asks this court to follow *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275 (*Ritchie*). That case is not helpful here. In *Ritchie*, the court was not determining the definition of victim for a protective order under section 136.2, subdivision (i)(1). Instead, the court was concerned about a renewal of a protective order under Family Code section 6345. In construing that statute, the appellate court noted "in contested cases, a court is only justified in ordering an extension of such an order where it finds to do so will advance the legislative purpose of preventing abuse. This means it must find evidence there is some reasonable risk, at least, such abuse will occur sometime in the future if the protective order is not renewed." (*Ritchie*, at p. 1287.)

In addition, Alexander's reliance on *Ritchie* actually undermines his argument that the protective order in favor of K.S. is an unauthorized sentence. "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) However, the appellate court in *Ritchie* did not address an unauthorized sentence, but instead, discussed what evidence was required for renewal of a restraining order under Family Code section 6345. (See *Ritchie, supra*, 115 Cal.App.4th at p. 1287.)

Further, Alexander does not argue that K.S. could never be a victim for purposes of a protective order under section 136.2, subdivision (i)(1). Rather, he maintains "no evidence was presented that she needed any protection from [him]." In other words, Alexander is arguing that K.S.'s circumstances do not warrant a protective order under that subdivision. Specifically, he observes that a protective order is not warranted in her case because there is no evidence she had "any reasonable apprehension of fear," K.S. had not seen Alexander for over ten years since he pled guilty to his crime against her, and

there was no evidence that K.S. requested a protective order.  These are all arguments he could have raised in the trial court that would address whether a protective order was warranted under the circumstances.  These are not arguments that the court lacked the authority to issue the protective order.

In short, K.S. was a victim as defined under section 136, subdivision (3).  Moreover, it is undisputed that Alexander was convicted of a crime of domestic violence against her thus triggering the possibility of a protective order under section 136.2, subdivision (i)(1).  We therefore conclude the court was authorized to issue a protective order in K.S.'s favor after trial in the instant action.  K.S. testified against Alexander in his current domestic violence case, she was previously married to Alexander, and was the victim of domestic violence at the hands of Alexander.  If Alexander did not believe these circumstances warranted a protective order as to K.S., he could have objected.  He did not do so, and thus forfeited his objections here.  (See *People v. Trujillo*, *supra*, 60 Cal.4th at pp. 856-857.)

In somewhat of a throw-away argument, Alexander contends that if we find forfeiture on appeal, then of necessity his counsel provided ineffective assistance of counsel under the Sixth Amendment.  Alexander bears the burden of showing counsel's representation was defective, and he was prejudiced as a result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 690 (*Strickland*).)  On the record before us, Alexander cannot satisfy either prong of the *Strickland* test.

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's

13

performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966; see *Strickland*, *supra*, 466 U.S. at pp. 690, 694.)

Alexander contends there is no satisfactory explanation for his trial counsel's failure to object to the issuance of a protective order in favor of K.S. Although defense counsel's reasons for failing to object are not explicitly stated in the record, there is a plausible tactical reason for a lack of objection. When counsel represented to the court that he did not "have any issues with" the issuance of protective orders for both K.S. and S.L., he was arguing to minimize the amount of prison time Alexander would receive. Defense counsel could have believed it prudent strategy to agree to the issuance of protective orders in favor of two victims of domestic violence perpetuated by Alexander to persuade the trial court that it would be safe to give Alexander a lesser sentence. Alternatively stated, counsel could have believed the issuance of protective orders against Alexander's victims would decrease the amount of prison time his client would have to serve.

The decision whether to object to an argument is an inherently tactical one that is not ordinarily reviewable on appeal. (*People v. Harris* (2008) 43

14

Cal.4th 1269, 1290; *People v. Frierson* (1991) 53 Cal.3d 730, 749.) And usually, " 'where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) Under these principles, no ineffective assistance of counsel appears here.

In addition, Alexander's claim of ineffective assistance fails for the absence of a showing of prejudice. (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*Ibid*.) Here, Alexander has offered no argument that he suffered prejudice. Instead, he merely repeats his argument that the protective order was unauthorized and then assumes the court would have sustained an objection to it. Put differently, Alexander simply asks us to assume he was prejudiced. We will not do so. As such, he has not shown he was prejudiced by his counsel's failure to object.

## DISPOSITION

The order is affirmed. We remand this matter to the superior court with instructions that the court indicate the protective order as to K.S. was issued under section 136.2, subdivision (i)(1). To avoid any confusion and to correct an additional scrivener's error, we also direct the court to make the same correction on the protective order form as to S.L.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

GUERRERO, J.

16